## Louisville & Nashville Railroad Company v. Kenney's Administrator.

((Decided January 28, 1915.)

### Appeal from Gallatin Circuit Court.

1. Railroads—Action for Personal Injuries—Signals.—In a suit to recover of a railroad company for personal injury occasioned by being struck by a train while standing on its station platform, if the jury believed from the evidence that the platform was an unusually dangerous one, under the circumstances, it was the duty of the company to use some reasonably effective means other than the statutory signals to warn those on the platform of the approach of its train.

2. Railroads—Negligence—Question for Jury.—It is a question for the jury as to whether the defendant was guilty of such contributory negligence as to preclude a recovery.

R. B. BROWN, GEORGE B. WINSLOW and BENJAMIN D. WARFIELD for appellant.

CLORE, DICKERSON & CLAYTON and BOTTS & PERRY for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

L. F. Kenney was killed by one of appellant's passenger trains while standing on the platform at Glencoe Station, and his administrator sues to recover damages of appellant, alleging that his death was the result of negligence of appellant's servants in the operation of its trains. The jury returned a verdict for $10,000.

Decedent was a general merchant at Glencoe, in Gallatin county, and about 43 years old. He left his place of

business and went to the depot nearby to have conversation with his nephew, who was a passenger on appellant's train No. 10, northbound from Louisville. This train was due to run at 9:27 A. M. He was killed by another train of appellant, No. 5, southbound from Cincinnati, which was due to run at the same time. This had been the regular schedule of the two trains for at least a year, and for probably two or three years. Both trains were three or four minutes late in reaching the depot, and the northbound train from Louisville, No. 10, reached there first. It was not more than a minute until the train from Cincinnati arrived. Many of the witnesses say that the Louisville train was just coming to a stop when the Cincinnati train went by the platform. Anyhow, all agree that as the Cincinnati train went by the conductor and porter of the Louisville train were still on the car steps and no passengers had alighted. There is no platform next to the depot for the use of passengers in boarding and leaving trains. In lieu of this, the space between the main track and the siding is filled with crushed stone. This space is filled from rail to rail between the two tracks, and is 12 feet wide and about 300 feet long. To reach this platform there is a walkway from the depot across two passing tracks. The one next to the depot is called the house-track, and the one alongside the platform referred to is the passing track, and the next on the other side of the platform is the main track. These trains sometimes met at the end of the passing track, that is, the train first to arrive would finish work at the depot, and then move on to the end of the siding to wait for the other train. It was not an unusual occurrence, however, for both of them to be at the depot at the same time. On this occasion there were from 25 to 50 people on the platform, and toward the north end of it, nearest the approaching Cincinnati train, there were two or more baggage trucks, and some calves to be loaded on one of the trains. The noise of No. 10, the Louisville train, as it came in must have kept those on the platform from hearing No 5. as it blew for the station. Steam was also escaping loudly from the pop valve on the Louisville train. There is much evidence that the Cincinnati train did not blow the station whistle, or any other whistle signal, until at or about the time it hit Kenney. Those who were on the platform say they did not hear it, but

they admit that they could not have heard it because of the noise from the Louisville train. The trainmen testify, and it may be accepted as a fact, that the usual whistle was blown for the station. There are two street crossings between the whistling place for the station and the depot. The trainmen say customary crossing signals were blown at these streets, but there is quite a conflict in the proof on this point. Anyhow, no one disputes the testimony of the trainmen that the bell was ringing all the time, although those on the platform did not hear it. In fact, it could not have been heard for the noise of the other train.

As above stated, this station platform between the passing and the main track was filled with rock, and extended from rail to rail and was 12 feet wide. The cylinder and cross-beam of an engine on one track extended over the platform 26 inches. With a train at the same time on both tracks, a clearance is left of only 7 feet and 8 inches. Such a space is too close for comfort or safety between moving trains. The evidence shows that Kenney knew the train schedules. Of course, he knew, and all those on the platform knew, the Louisville train, the first to arrive, was a few minutes late, but there is nothing in the record to show that Kenney, or any of them, knew how much delayed was the Cincinnati train, or whether it would come up to the station before the Louisville train left. Anyhow, Kenney was interested in the Louisville train. His nephew was expected to be on it. Kenney's purpose was to converse with him and perhaps get aboard, depending on the conversation. Naturally he was on the lookout for him in order to talk with him as quickly as possible. He, with all the others on the platform, moved over toward the main track as the Louisville train was coming in. Kenney was standing there with his back to the main track, and close to it in order to get a better chance to see his nephew through the car windows of the Louisville train. While in this position, and as the first train was just stopping, the Cincinnati train came in, and, as it is testified to by many of the witnesses, at an unusually high and dangerous rate of speed, and without any warning of its approach. Kenney was hit by it in the side by the projecting cross-beam and instantly killed. His body was knocked over on the platform and was picked up 30 feet from the place where he

stood. It is apparent from the testimony of appellee's witnesses that they believed he was knocked 30 feet by the impact, although, from their description of his fall, it is possible that they are mistaken in this. He may have been dragged or rolled that distance by the train. Some of the testimony and argument on both sides as to the speed of the train is to some extent based on this circumstance together with his instant death. Some of appellee's witnesses say the train came to the station at a speed of 25 miles an hour. All of them say the train came in faster than usual. There is no question but that the approach and passing of the train occasioned fear in the minds of those who did see it. The conductor and other officials on the Louisville train began to shout alarms, and some of those on the platform began to shove the people back towards the Louisville train and away from the main track. One witness, who had formerly been in the railroad service, got on the main track and gave signals for the Cincinnati train to stop or slow down. But those who saw this say that no attention was paid to the signals, and the man on the track had to jump to save himself. This witness says that he gave the stop signal partly for the safety of those on the platform and also to keep the Cincinnati train from striking some of the calves there for loading, and which had gotten on the track. The calves were gotten off just in time. Accepting the statements of the trainmen as true as to whistling for the road crossing, then the closest whistle to the station was about 500 feet. No other whistle was blown until the time the train hit Kenney. The engineer and fireman say that they did not see him until they were in 10 or 15 feet of him, and then he took a step backwards, and they immediately gave sharp blasts of the whistle, but it was impossible to stop before hitting him. As a matter of fact, the engine did not stop until it had gone 150 feet beyond him. Kenney was standing at or near about the place where the engine would have stopped in the usual course of things, but appellant argues that the engine actually stopped where it was intended to stop and where it ought to stop. Attention is called to the fact that the train that morning had two extra baggage cars, and, with this unusual length of train, the engine, of course, stopped at a place further away than customary. It is seriously argued that this is such a physical fact as

to render unworthy of consideration all the opinion evidence as to the high rate of speed.

In our opinion there was a question of fact as to the speed of the train, and as to the blowing of the station and road crossing whistles. Anyhow, there were certainly two questions of fact which properly should have been and were submitted to the jury, and the first is, whether the means employed were reasonably effective or sufficient, under the circumstances of this case, and considering the nature of the platform, to warn those on it of the approach of the train. No question is raised as to their right to be on the platform at the time. Those in charge of the train had a clear view of the platform for 1,500 feet. They knew and could see the other train was coming to a stop on the siding, and that its presence narrowed the narrow platform. They knew how the platform would be still further narrowed by the occupancy of the main track by their train. They could see how the platform was crowded, and that the attention of those there was taken by the other train just arriving, and how its noise would render it unlikely that they would hear the approach of the coming train. If the jury believed from this evidence that the station platform was an unusually dangerous one by reason of these facts, it was the duty of the appellant to use some reasonably effective means other than the station or statutory signals to avert the danger, and warn those on the platform of the approach of the train, which killed decedent, and its failure to give such other warning was actionable negligence. C. & O. v. Gunter, 108 Ky., 362; C., N. O. & T. P. Ry. Co. v. Champ, 31 Ky. L. R., 1057; Southern Ry. v. Thacker's Admr., 156 Ky., 483.

As stated in the Gunter case.

"The care required of the company must be commensurate with the danger. Where it has created an extraordinary danger, it is required to exercise extraordinary care; and what is due care in the particular case must depend upon the existing state of circumstances at the time of the injury, and it is a question for the jury to decide."

It is true these cases were for injuries at public road crossings, but the travelers were licensees, as in the case at bar, and, as stated in the Champ case:

"The central idea in all of them is that the company must use such care and precaution for the safety of travelers as the character of the crossing makes reasonably necessary for their safety and protection. What this degree of care is must depend upon the facts of each case, and is a question for the jury."

See also L. & N. v. McNary, 128 Ky., 408.

Likewise, it is a question for the jury as to whether the deceased, as a licensee, was guilty of such contributory negligence as to preclude a recovery when, according to appellant's evidence, and by inference drawn from the evidence of one or two of appellee's witnesses, the deceased, while looking into one train, inadvertently stepped back too close to the other track and before those operating the train approaching on that track could warn him, or avert the killing. Lewis' Admr. v. Bowling Green Gas Light Co., 135 Ky., 611, 117 S. W., 278, 22 L. R. A. (n. s.), 1169; Conway v. L. & N., 135 Ky., 299, 119 S. W., 206.

We have examined the instructions carefully and are impressed that the relative duties of the parties and the questions of fact were fairly submitted, with the proper application of the principles of law pertaining thereto. As to the measure of damages, the instruction differs somewhat from the approved form in such cases. The jury were told "and in estimating the damages, if any, they should consider only the loss of power of the deceased to earn money." Ordinarily, mere verbal inaccuracies are not prejudicial, but in order to have a uniform application of the law throughout the State, it is the better practice for courts to instruct juries in the identical words which have received the approval of this court. The approved form is to award "such damages as you may believe from the evidence will reasonably and fairly compensate decedent's estate for the destruction of his power to earn money, not exceeding, etc." But we are unable to see that appellant has been prejudiced by the words used in the instructions given, or the failure to use the approved form.

The court refused to give an instruction offered by appellant to the effect that, although the servants in charge of the incoming train saw Kenney in a place of danger, yet they had the right to believe that he would move out of the way of the train and into a place of safety, and that this presumption continued until the

employes saw, or by the use of ordinary care could have seen, that Kenney was oblivious to the fact that he was in danger. There is no fact proven to show that Kenney was ever conscious of his danger, nor is it contended that the employes in charge of the train saw Kenney until about the moment the train hit him. The right of recovery was not whether the employes could have averted the injury after seeing him. The questions were whether they negligently failed to give decedent warning of the approach of the train, and whether, in view of the crowded condition of the platform, which they could plainly see, and the presence and noise of the other train alongside, there was negligence in the operation of their train.

The judgment of the lower court is affirmed.